IN THE COURT OF COMMON PLEAS, MONROE COUNTY, OHIO

ZACHARY T. MILLER, an Incapacitated
Adult, by and through CATHERINE A. MILLER,
his natural mother, Guardian of Person and Estate
and Conservator
8556 Lawson Avenue
Norfolk, VA 23503

and

CATHERINE A. MILLER
8556 Lawson Avenue
Norfolk, VA 23503

and

GLENN A. MILLER
8556 Lawson Avenue
Norfolk, VA 23503

      Plaintiffs,

v.

CNX GAS COMPANY, LLC,
c/o Registered Agent
CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060

and

HALLIBURTON COMPANY d/b/a
"Halliburton Cement Services,"
3000 N. Sam Houston Pkwy. E.
Houston, TX 77032

and

Case No. 2019-227

Judge SELLOR

1

EXHIBIT 7

John/Jane Doe #1-25
Addresses Unknown

        Defendants.

## COMPLAINT

The Plaintiffs, Zachary T. Miller, an Incapacitated Adult, by and through Catherine A. Miller, his natural mother, Guardian, and Conservator, and Catherine A. Miller and Glenn A. Miller, individually, state as follows:

### *Parties, Jurisdiction, and Venue*

1. Plaintiffs are Virginia residents. Plaintiff Catherine A. Miller is the court appointed unlimited guardian and conservator of Zachary T. Miller. The Order Appointing Guardian and Conservator is attached as Exhibit 1.

2. At all relevant times, Patterson-UTI Drilling Company, LLC ("Patterson") employed Zachary T. Miller ("Zachary Miller") as a driller.

3. Defendant CNX Gas Company, LLC ("CNX") is a Virginia limited liability company engaged in the acquisition, exploration, development, and production of oil and natural gas. At all relevant times, Defendant CNX conducted business in Monroe County, Ohio.

4. Defendant Halliburton Company d/b/a Halliburton Cement Services ("Halliburton") is a Texas company that provides cementing services to the oil and natural gas industry. At all relevant times, Defendant Halliburton conducted business in Monroe County, Ohio.

2

5. At all relevant times, Defendants John/Jane Doe #1-25 are persons and /or businesses whose names and addresses could not be discovered.

6. This court has subject matter jurisdiction under R.C. 2305.01 and R.C. 2307.382 and personal jurisdiction over Defendants because CNX and Halliburton purposefully conducted business in the State of Ohio, such that each has availed itself of the privileges of conducting business in the State of Ohio, and has rendered itself subject to jurisdiction based, in large part on the injuries and losses of the Plaintiffs, as alleged herein, caused by each Defendant's in-state activities, among other reasons.

7. R.C. 2307.382, Ohio's long-arm statute, authorizes the exercise of personal jurisdiction over nonresident defendants. Civ. R. 4.3 provides for service and determines the "minimum contacts" necessary to effectuate that jurisdiction.

8. Venue is proper in this court pursuant to Rule of Civil Procedure 3(C)(3) because the activities of Defendants CNX and Halliburton giving rise to this civil action were conducted in Monroe County, Ohio.

## Common Factual Allegations

### The Work Site

9. At all relevant times, CNX owned certain real property rights and oil and gas leases in Monroe County, Ohio, including certain property known as well number 34-11-2-4806-00-00.

10. On or before April 2018, CNX was issued a permit to drill, install, and

3

operate an oil and gas well at well number 34-11-2-4806-00-00 ("the well").

11. CNX established a work site at the well for the purposes of extracting natural gas.

12. Oil and natural gas extraction involves multiple steps, including, but not limited to, preparing the rig site, drilling a deep hole, cementing steel well casing in place in the deep hole, well completion, and fracking.

13. CNX retained Patterson as an independent contractor to perform drilling operations at the well, and Patterson provided drill rig 803 for the project.

14. CNX retained Halliburton to provide cementing services at the well, which included cementing steel casings in place in the deep hole Patterson drilled.

15. At all relevant times, CNX exercised exclusive control over the natural gas extraction project being performed at the well.

16. At all relevant times, employees and/or agents of CNX were responsible for supervising the work Patterson employees and agents on rig 803 performed.

17. Although CNX had the right to control the natural gas extraction project, it did not control the manner and means of the work employees of its independent contractors performed.

18. CNX actively participated in the specific job activities of the employees of Halliburton and Patterson, including Zachary Miller.

4

*The Work Environment*

19. On April 3, 2018, after Patterson through its employees and/or agents drilled the deep hole at the well, the drill pipe was removed and then steel casing was threaded together in pieces and pushed to the hole's bottom.

20. The well casing was cemented in place by pressure pumping cement slurry from a cement truck down the casing, which forces slurry up the casing's sides. Halliburton through its employees and/or agents undertook and performed the cementing process.

21. During this process, the casing is under constant pressure, so heavy-duty chains are used to hold down a cement well head sleeve to prevent the steel casing from being forced up and out of the hole before the cement dries and secures it in place. CNX, through its employees and/or agents, placed the heavy duty chains at well number 34-11-2-4806-00-00.

22. High pressure release valves, which are sometimes referred to as rupture pins, pressure pins, or pop-off pins ("pressure pins"), are utilized along the cement line. Pressure pins are designed to hold the release valve in a closed position until pressure reaches an exact set point. At the set point, the valve opens in milliseconds for immediate pressure relief. Such pressure pins/release valves are crucial for safely managing pulsating pressures. Halliburton, through its employees and/or agents, selected the pressure pins and the set point of the pressure pins utilized at well number 34-11-2-4806-00-00.

5

23. For pressure pins to serve their safety function, the PSI required to open the pressure release valves must be below the PSI required to break the weakest section of casing and/or the chains that were holding down the well head sleeve.

24. In the oil and gas extraction industry, rig workers for all contractors involved in the process are trained to and have the right and duty to call a stop or "time out for safety" (TOFS) if the worker believes that a safety hazard exists that jeopardizes his/her safety or any other worker on the site.

25. On April 3, 2018, at all relevant times, employees and/or agents of Defendants Patterson, Halliburton and CNX were trained to and had the right and duty to call stop or TOFS.

26. CNX supervised and actively participated in all phases of the project, including the drilling, casing, and cementing phases.

27. Prior to Zachary Miller's injury, CNX was aware that one or more of the sections of casing placed in the hole had been cross-threaded, rendering such casing unreasonably dangerous and unable to withstand the pressure for which those sections were rated.

28. Workers involved in the casing installation reported the cross-threading issues addressed above to the onsite CNX supervisor(s), including without limitation Chad Schoffner. Instead of directing the workers to remove and re-thread the unsafe cross-threaded casing, the CNX supervisor(s), including Chad

6

Schoffner, specifically instructed the workers to put the cross-threaded casing into the hole.

29. At some point during the cementing process, a Halliburton employee, believed to be Dan Kover, discovered that the set point or PSI required to open the pressure release valve on the pressure pins along the cement line was higher than the burst pressure of the casing, creating a significant safety hazard to workers at the drilling rig.

30. The Halliburton employee called a TOFS to notify Halliburton and CNX supervisors of the safety hazard and to request that the pressure pins be replaced with appropriate pins and/or that the set points be adjusted.

31. The request to replace or adjust the pressure pins for safety purposes was made to the onsite CNX supervisor, Chad Shoffler, and/or to the Halliburton supervisor. Instead of stopping for safety and replacing the pins, CNX supervisor Chad Shoffler and/or the onsite Halliburton supervisor specifically instructed the team to continue preparing the well without replacing and/or adjusting the pins.

32. CNX and Halliburton, through their agents and employees, including Chad Shoffler, were specifically aware of the TOFS called by the Halliburton employee. CNX and Halliburton, through their agents and employees, decided to ignore the safety concern raised and to continue preparing the well.

33. The chains used to hold down the cement well head sleeve are required to be tagged indicating that they are approved heavy-duty chains that are PSI-

rated and safe to use for that function.

34. CNX, through their agents and employees, including Chad Shoffler, caused unsafe, untagged chains to be used to hold down the cement well head sleeve.

35. The use of cross-threaded casing, improper pressure pins, and untagged chain all created a safety hazard.

*The Incident*

36. In connection with undertaking the cementing process, Halliburton performed the specific tasks, including monitoring the pressure readings from their pump trucks and trailers, and reporting the same to CNX, which exercised control over the entire project.

37. Once a pre-determined amount of cement has been pumped into the casing through a line that enters the casing *below* a top plug, the cement line is closed and fluid is pumped through a line that enters the casing *above* the top plug.

38. Pumping cement above the top plug pushes the plug down and causes the cement inside the casing to be displaced out of the bottom of the casing and up the outside exterior walls of the casing, where it eventually dries and bonds the casing in place in the hole.

39. Prior to proceeding with the next phase of the project, it is necessary to verify that the plug has dropped.

40. The way the drilling team would verify that the plug has dropped was

by physically visualizing whether a wire extending from the top of the plug out of the top of the casing has disappeared. This requires an individual to enter the drilling floor, climb a ladder, and actually look into the hole to determine whether the wire is extending from the top of the plug.

41. The verification process described above can only safely be performed if the drilling floor is no longer under an amount of pressure rendering it unsafe for a person to be on the floor.

42. On April 3, 2018, one of Zachary Miller's job assignments was to check whether the wire was extending from the top of the plug after the cement was pumped through the casing.

43. During the cementing process described above, Zachary Miller remained in an area known as the driller's cabin with no access to the data from Halliburton's pressure readings.

44. While in the driller's cabin, Zachary Miller had no way to independently determine what the pressure on the drilling floor was at any particular time and whether it was safe for him to go onto the floor.

45. Zachary Miller relied upon the onsite CNX supervisor believed to be Chad Shoffler – who was privy to Halliburton's pressure readings – to notify him when the drilling floor was safe to enter.

46. Knowing that the drilling floor was under an unsafe amount of pressure and unsafe to enter, CNX, by and through its onsite supervisor Chad

9

Shoffler, directed Zachary Miller to exit the driller's cabin and enter the drilling floor to check the plug wire.

47. CNX, by and through its onsite supervisor Chad Shoffler, assured Zachary Miller that it was safe for him to enter the drilling floor to check the plug wire.

48. As directed, believing the drilling floor was safe, Zachary Miller left the driller's cabin, entered the drilling floor, and climbed a ladder so he could check on the status of the plug wire.

49. Unbeknownst to Zachary Miller, the drilling floor was under dangerously high pressure, rendering it unsafe for him to enter.

50. CNX, by and through its onsite supervisor Chad Shoffler, was aware that the floor was under high pressure and not safe to enter but failed to notify Zachary Miller of the situation.

51. While Zachary Miller was on the ladder attempting to check the status of the plug wire, a section of casing broke, causing an uncontrolled burst of pressure. The casing broke due to a combination of negligent acts by the Defendants, including but not limited to the use of cross-threaded casing, the over-pressurization of the hole, the use of incorrect pressure pins to warn of over-pressurization, and the use of unsafe, un-tagged chain to hold down the cement well head sleeve.

52. The pressure caused a large chain holding down the cement casing to

10

break, and a piece of the chain (or the hook attached to the chain) struck Zachary Miller in the head, shattering his safety helmet and skull and lodging in his brain. As a result, Zachary Miller suffered catastrophic and permanent bodily injuries.

53. At all times relevant, Defendants acted by and through their employees, agents or servants who were acting in the course and scope of their employment, agency or relationship with Defendants. Defendants are vicariously liable for the negligence of their employees, agents, and servants.

## COUNT I

### Negligence Against CNX Gas Company, LLC

54. The Plaintiffs incorporate each and every allegation above, as though fully set forth herein verbatim.

55. At all relevant times, CNX was the owner and operator of the well and the principal contractor of the natural gas extraction work performed at said location.

56. At all relevant times, CNX had duties to exercise ordinary care to recognize and remedy all safety, environmental, and geographical hazards at the work site; to have the worksite in a reasonably safe condition; and to warn of any unsafe condition about which it knew, or by the use of ordinary care should know. Supervisory personnel from CNX, including Chad Shoffler, were present at the work site each day to carry out these duties.

11

57. In addition, CNX was responsible for performing a daily inspection of the job site and identifying and resolving all potential safety hazards, environmental hazards, and geographical hazards that might arise during each work day.

58. The work performed at the well was inherently dangerous, with an increased risk of injury to workers in the event any safety, environmental, or geographical hazards went uncorrected.

59. Despite the foregoing, CNX breached its duty to provide a reasonably safe workplace for Zachary Miller by instructing Zachary to come to the floor when it was unsafe to do so; by ignoring a TOFS or notice that one or more sections of the casing being placed in the hole were cross-threaded; by instructing the workers who notified CNX that one or more sections of casing were cross-threaded to ignore the hazard and place them in the hole; by causing one or more sections of cross-threaded casing to be placed in the hole; by ignoring a TOFS from a Halliburton employee who called the TOFS because the set point or PSI required to open the pressure release valve on the pressure pins along the cement line was higher than the burst pressure of properly threaded casing; by using unsafe, untagged chain; and by negligently and knowingly allowing safety violations and hazards to go uncorrected -- including, but not limited to:

    a. Using cross-threaded casing during the cementing process;

    b. Using pressure pins that were not properly calibrated for the

12

project;

c. Using a chain during the cementing process that had insufficient tensile strength;

d. Directing Zachary Miller to enter the drilling floor while it was under high pressure;

e. Failing to take corrective measures with regard to the cross-threaded cement casing after becoming aware of its existence;

f. Failing to take corrective measures with regard to the incorrect pressure pins after becoming aware of their existence;

g. Allowing and/or directing the Halliburton employees to continue the cementing process despite being aware of the cross-threaded casing and incorrect pressure pins;

h. Allowing and/or directing Zachary Miller to carry out his normal job duties, which involved entering the drilling floor, despite having access to Halliburton's pressure readings and being aware of safety hazards created by the cross-threaded casing, incorrect pressure pins, and chain with insufficient tensile strength; and

i. Failing to effectively communicate with other workers (e.g. Halliburton employees) regarding the pressure reading in the moments prior to Zachary Miller's suffering his profound

13

injuries.

60. As a direct and proximate result of CNX's negligence, Zachary Miller has medical bills in an amount to be determined at or before trial, including hospitalization and surgeries, suffered a serious and permanent bodily injury, requiring past, present, and future medical care and treatments.

61. As a further direct and proximate result of CNX's negligence, Zachary Miller suffered, and will continue to suffer from loss of enjoyment of life, aggravation, annoyance, inconvenience, emotional distress, mental anguish, past and future pain and suffering, and past and future lost wages.

62. As a direct and proximate result of Defendants' negligence, Zachary Miller sustained a permanent loss of enjoyment of life, permanent and substantial physical deformity, loss of a bodily organ system, and a permanent physical functional injury that permanently prevents him from being able to independently care for himself and perform life-sustaining activities.

## COUNT II

### Negligence Against Halliburton Company d/b/a Halliburton Cement Services

63. The Plaintiffs incorporate each and every allegation above, as though fully set forth herein.

64. At all relevant times, Halliburton was responsible for performing and performed all of the work associated with the cementing process at the well.

14

65. Halliburton had duties to use ordinary care in performing the cementing process, including providing proper equipment for this task, and recognizing and remedying all safety, environmental, and geographical hazards associated with this task.

66. The work being performed at the subject well by Halliburton was an inherently dangerous activity, with an exponentially higher risk of injury to workers as a result of ignored and/or uncorrected safety hazards not brought to the attention of the driller for the rig, Zachary Miller.

67. Halliburton breached its duty to provide a safe workplace for Zachary Miller by using pressure pins with incorrect set points along the cement line; by ignoring a TOFS from a Halliburton employee who called the TOFS because the set point or PSI required to open the pressure release valve on the pressure pins along the cement line was higher than the burst pressure of properly threaded casing; by over-pressurizing the hole; by acquiescing in CNX's decision to use cross-threaded casing during the cementing process; by acquiescing or participating in the decision to use unsafe, untagged chains to hold down the cement well head sleeve during the pumping process; and by negligently and knowingly allowed safety violations and hazards to go uncorrected – including, but not limited to:

    a. Using a chain with insufficient tensile strength during the cementing process;

    b. Failing to warn Zachary Miller when the pressure on the drilling

15

   platform was outside the expected and safe range;

 c. Directing and/or allowing the cementing process to continue despite knowing that unsafe pressure pins were installed on the cement line;

 d. Ignoring a TOFS concerning the unsafe pressure pins;

 e. Directing and/or allowing the cementing process to continue despite knowing the chain had insufficient tensile strength;

 f. Over-pressurizing the hole and directing and/or allowing the cementing process to continue despite knowing the pressure on the drilling platform was outside the expected and safe range; and

 g. Failing to effectively communicate to all workers on the rig that Halliburton was violating known safety rules, and thus, creating a serious hazard for all workers on the rig, including Plaintiff Zachary Miller by exposing them to excessive pumping pressure at the rig, which was a direct and proximate cause of the subject injuries and damages to Plaintiff Zachary Miller.

68. As a direct and proximate result of Defendants Halliburton's negligence, Zachary Miller suffered a serious and permanent bodily injury, requiring past, present, and future medical treatments as set forth in this Complaint.

## COUNT III

### *Respondeat Superior*

69. The Plaintiffs incorporate each and every allegation above, as though fully set forth herein verbatim.

70. At all relevant times, Defendants acted by and through their employees, agents or servants who were acting within the course and scope of their employment, agency, master-servant relationship, retention agreement, and/or contractual relationship with Defendants.

71. At all relevant times, the employees, agents and servants of Halliburton were acting within the course and scope of their employment, agency, master-servant relationship, retention agreement, and/or contractual relationship with CNX.

72. Pursuant to the doctrine of *respondeat superior*, Defendants are vicariously liable for the negligence of their employees, agents and servants, and CNX is vicarious liable for Haliburton's negligence, and the damages set forth in this Complaint.

## COUNT IV

### *Loss of Consortium & Services*

73. The Plaintiffs incorporate each and every allegation above, as though fully set forth herein.

17

74. At all relevant times, Zachary Miller's parents, Catherine Miller and Glenn Miller, provided extensive care of and for their son, and, as a consequence, have incurred financial losses, in addition but not limited to the value of the household services they have performed, and continue to perform.

75. At all relevant times, Catherine Miller and Glenn Miller sustained past, present, and future loss of familial companionship, society and support of their son, Zachary Miller.

## Count V

### *Vicarious Liability*

76. Plaintiffs incorporate all above paragraphs by reference.

77. Upon information and belief, Defendants John Does #1-25 committed negligent acts and/or omissions which directly and proximately caused Plaintiffs' injuries and damages as stated in this Complaint.

78. Upon information and belief, Defendants John Does #1-25 were vicariously liable for the negligent acts and/or omissions of others which directly and proximately caused Plaintiffs' injuries and damages as stated in this Complaint. As such, Defendants John Does #1-25 are liable for all injuries and damages as stated in this Complaint.

WHEREFORE, each Plaintiff demands judgment, jointly and severally, in an amount in excess of $25,000 against each and every Defendant for all damages as a result of negligence, for which they are vicariously liable, together with pre-judgment and post-judgment interest thereon; for all costs and attorney fees incurred in pursuit of this action to which Plaintiffs are entitled by law; and for such other relief as this Court deems proper.

PLAINTIFFS DEMAND A TRIAL BY JURY OF EIGHT (8).

Respectfully submitted,

Kitrick, Lewis & Harris Co., L.P.A

*/s/ Mark Kitrick*
Mark Kitrick (0000021)
445 Hutchinson Avenue, Suite 100
Columbus, Ohio 43235
Tel: 614-224-7711
Fax: 614-225-8985
MKitrick@klhlaw.com

Elizabeth Mote (0086379)
445 Hutchinson Avenue, Suite 100
Columbus, Ohio 43235
Tel: 614-224-7711
Fax: 614-225-8985
Laz@klhlaw.com

*Trial Attorneys for Plaintiffs*

19

Jeffery L. Robinette, Esq. (West Virginia Bar #5786)
Robinette Legal Group, PLLC
211 Everhart Drive, Suite 200
Morgantown, WV 26508
Phone: 304-594-1800
Fax: 304-594-0000
jeff.robinette@robinettelaw.com

Michael G. Phelan, Esq. (Virginia Bar #29725)
Jonathan M. Petty, Esq. (Virginia Bar #43100)
Brielle M. Hunt, Esq. (Virginia Bar #87652)
Phelan | Petty, PLC
6641 West Broad Street, Suite 406
Richmond, VA 23230
Phone: (804) 980-7100
Fax: (804) 767-4601
mphelan@phelanpetty.com
jpetty@phelanpetty.com
bhunt@phelanpetty.com

*Pro Hac Vice To Be Filed*